**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ELIS FOR RACHAEL, INC., ALICIA ABRAMSON and HANNAH NEVES, on behalf of themselves and those similarly situated, | Case No. |
| *Plaintiffs*, | November 30, 2022 |
| v. | |
| YALE UNIVERSITY and THE PRESIDENT AND FELLOWS OF YALE UNIVERSITY, | |
| *Defendants*. | |

**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs, by and through their attorneys, allege as follows:

**PRELIMINARY STATEMENT**

1.      This action—on behalf of students at Yale, the organization Elis for Rachael, Inc. and a proposed class—seeks to remedy Yale University's systemic discrimination against students with mental health disabilities, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182, *et seq.*; Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794(a), *et seq.*; the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*; and Section 1557 of the Patient Protection and Affordable Care Act ("Section 1557").

2.      Yale offers undergraduate and graduate academic programs that are highly competitive and consistently rated among the top in the country.

3.      For decades, Defendants Yale University and the President and Fellows of Yale (collectively "Yale") have treated unequally and failed to accommodate students with mental health disabilities, including by modifying policies,[1] in violation of federal law.

4.      Yale's withdrawal policies and practices push students with mental health disabilities out of Yale, impose punitive consequences on students who have withdrawn, and place unreasonable burdens on students who, after a withdrawal, seek reinstatement.

5.      Yale also imposes on all students, regardless of disability, requirements that make it almost impossible to attend the university for any less than full-time enrollment and refuses or makes it unreasonably difficult to secure accommodations for disabilities in coursework or housing.

6.      The impact of Yale's discriminatory policies is harshest on students with mental health disabilities from less privileged backgrounds, including students of color, students from poor families or rural areas, and international students.

7.      Yale's discriminatory policies leave students with mental health disabilities from less privileged backgrounds at risk of losing their health insurance coverage. They have no option to continue coverage when they withdraw, despite their need to attend to their mental health disability.

8.      Yale's withdrawal and reinstatement policies and practices have received national attention. The Ruderman Foundation, in consultation with national experts, examined leave of

---

[1] The terms "accommodate" or "accommodations," as used herein, include making modifications to policies, practices, and procedures.

Case 3:22-cv-01517-MPS   Document 1   Filed 11/30/22   Page 3 of 41


absence and withdrawal policies at Ivy League schools and gave Yale a grade of F, lower than six other Ivy League schools.[2]

9.      Yale's mental health policies and their devastating effect on students with mental health concerns were recently the subject of an article in the *Washington Post*.[3]

10.     For the past decade, members of the Yale community, including Plaintiff Elis for Rachael, have endeavored to persuade Yale to change its policies and practices. These efforts have resulted in little change.

11.     In a response described in the *Washington Post*, Yale claims that it recently launched a review of its withdrawal and reinstatement policies and practices and indicated it will make unspecified further changes.[4] It does not appear that this review addresses the full scope of the violations addressed in this Complaint.

12.     Plaintiff Elis for Rachael, though counsel, wrote to Yale on August 8, 2022, in an attempt to resolve these claims amicably and without the need to file this lawsuit. The parties have not yet met or discussed the issues raised in this complaint.

13.     Plaintiffs seek injunctive relief that would end Yale's discriminatory practices. Plaintiffs do not seek money damages.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

---

[2] Miriam Heyman, *The Ruderman White Paper on Mental Health in the Ivy League* (Dec. 10, 2018), https://rudermanfoundation.org/white_papers/the-ruderman-white-paper-reveals-ivy-league-schools-fail-students-with-mental-illness/ (none of the examined schools received a grade of C or higher).
[3] William Wan, *What if Yale Finds Out?*, THE WASHINGTON POST (Nov. 11, 2022, 7:00 AM), https://www.washingtonpost.com/dc-md-va/2022/11/11/yale-suicides-mental-health-withdrawals/.
[4] William Wan, *Yale defends mental health policies under fire from students, alumni*, THE WASHINGTON POST (Nov. 17, 2022, 6:47 AM), https://www.washingtonpost.com/education/2022/11/17/yale-mental-health-suicide-policies/.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391. A substantial part of the acts and/or omissions giving rise to the claims alleged in this Complaint occurred within this district.

## PARTIES

16.     Plaintiff Elis for Rachael is a 501(c)(3) nonprofit organization incorporated in Connecticut. Its mission is to advocate for and support students in crisis or who have a mental health disability, to increase awareness of mental health as a disability, and to advocate for better access and accommodations at Yale. Its leadership includes Yale alumni with mental health disabilities, as well as current students, family, and friends.

17.     Plaintiff Alicia Abramson is a current Yale undergraduate student in her third year. She has a disability within the meaning of the laws alleged in this Complaint.

18.     Plaintiff Hannah Neves is a current Yale undergraduate student in her fourth year. She has a disability within the meaning of the laws alleged in this Complaint.

19.     Defendant Yale University is a private university located in New Haven, Connecticut. As a place of education, Yale qualifies as a "public accommodation" under Title III of the ADA as that term is defined under 42 U.S.C. § 12181(7)(J). Yale is also a recipient of federal financial assistance within the meaning of Section 504 of the Rehabilitation Act ("Section 504") and Section 1557 of the Patient Protection and Affordable Care Act ("Section 1557") and operates health programs and activities within the meaning of Section 1557.

20.     Defendant President and Fellows of Yale University, also known as The Yale Corporation, is Yale University's principal governing and policy-making body.

<u>**FACTUAL ALLEGATIONS**</u>

**I.**     <u>**YALE'S DISCRIMINATION AGAINST STUDENTS WITH MENTAL HEALTH DISABILITIES**</u>

21.     Yale discriminates against students with mental health disabilities in a variety of ways.

**a.**  <u>**Yale Has Discriminatory Withdrawal and Leave Policies and Practices**</u>

22.     Yale has a written policy concerning students withdrawing for medical reasons ("medical withdrawal") or personal reasons ("personal withdrawal"), as well as for "leave of absence." Yale's policies use the phrase "leave of absence" when a student initiates time off, beginning no later than fifteen days into the academic term, and "withdrawal" for time off at a later date and Yale-initiated time away. Students take both forms of time off for mental health reasons, but students experiencing mental health crises are particularly likely to be subject to the withdrawal policies.

23.     Yale's withdrawal policy provides for involuntary withdrawals for disability-related symptoms, including threat to self. It does not provide for any deference to treating professionals or consideration of whether withdrawal will cause harm.[5] An involuntary withdrawal can come quickly and with little or no notice. Plaintiff Hannah Neves was involuntarily withdrawn from Yale within days of her seeking inpatient mental health treatment.

24.     Yale engages in a practice of pressuring students to take "voluntary" time off when they experience significant symptoms from a mental health disability. Yale indicates that, unless the student agrees to a "voluntary" withdrawal, Yale will or very likely will impose an

---

[5] *Yale College Programs of Study 2022-2023*: *Leave of Absence, Deferral, Withdrawal, and Reinstatement*, YALE UNIVERSITY, http://catalog.yale.edu/ycps/academic-regulations/leave-of-absence-withdrawal-reinstatement/ (last visited Nov. 29, 2022).

involuntary withdrawal on the student. In these interactions, measures to accommodate the student's disability are not consistently explored.

25.     For example, Yale officials told Plaintiff Hannah Neves and former students Nicolette Mántica and Brian Spence that they should take "voluntary" time off. All three students were told that it would not "look good" to resist voluntary time off. As described below, Yale officials told both Neves and Mántica that they would be involuntarily withdrawn if they did not withdraw voluntarily. In Mántica's case, Yale officials informed her that she would be perceived as a liability to the university. In Spence's case, both Yale officials and Yale New Haven doctors used almost identical language to pressure him to withdraw.

26.     Yale's written policy, and the widespread belief among students that seeking mental health treatment risks being pressured into "voluntary" withdrawal or being involuntarily withdrawn, deters students from seeking the mental health treatment they need and from requesting accommodations for their disability. As described below, Elis for Rachael member Rishi Mirchandani did not seek accommodations while a student at Yale for fear of disclosing his mental health disability and being involuntarily withdrawn.

   **b.  <u>Yale Imposes Unreasonable and Punitive Consequences on Students who Withdraw for Disability-Related Reasons</u>**

27.     Yale imposes a variety of restrictions and penalties on students who withdraw, including when their withdrawal is due to a mental health disability.

28.     Disturbingly, Yale bars withdrawn students, including students who withdraw due to a mental health disability, from visiting campus and from all campus activities, even activities that are open to non-students, such as summer classes.[6] Yale prohibits these students from being

---

[6] *Id.*

on campus unless they receive prior permission from Yale. There is no similar campus ban for students who take a leave of absence.

29.     Yale's policies require students on withdrawal to move out of their campus housing within 48 hours.[7] Additionally, as described below, Plaintiff Hannah Neves and former student Nicolette Mántica were required to have a police escort to return to their rooms to collect their belongings.

30.     Yale's withdrawal policies are especially punitive with respect to health insurance, which particularly harms less privileged students. Students who withdraw after the first fifteen days of the term remain enrolled in their health insurance plan for only 30 days (unless the term ends in a shorter period of time). They forfeit all completed payments for health insurance despite the termination of their coverage, as happened to Plaintiff Alicia Abramson. Unlike students who take a leave of absence during the first fifteen days of the term, they do not have the option to purchase and enroll in continued coverage under the Yale Health Student Affiliate program.

31.     Students who leave within the first fifteen days of the term have their health insurance terminated, immediately and retroactively, upon withdrawal, meaning the student is denied coverage for pre-withdrawal treatment and instead charged on a fee-for-service basis. They may elect to purchase and enroll in Yale Health Student Affiliate Coverage. Payments made for the term's insurance are forfeited unless they are applied to the affiliate coverage.

32.     Students who have to leave school for disability-related reasons during the term (whether voluntary or involuntary withdrawal) may not receive any rebate for tuition, room, and

---

[7] *Yale College Undergraduate Regulations 2022-2023: Housing*, YALE UNIVERSITY, http://catalog.yale.edu/undergraduate-regulations/regulations/housing/ (last visited Nov. 29, 2022); *see* Serena Puang, *"I had to choose between my education and my safety": How Yale's withdrawal and readmission policies leave students no choice but to stay*, YALE DAILY NEWS (Jan. 31, 2022), http://features.yaledailynews.com/blog/2022/01/31/testing/.

board payments. They forfeit between 25% and 100% of payment made for the term in which they are withdrawn if it occurs after the first fifteen days of the term. For example, a student who leaves after midterm may have paid for their housing and meal plan but once withdrawn they receive no rebate, losing 100% of the money they paid for that term. Further, under Yale's withdrawal policy, a student voluntarily or involuntarily withdrawn after the first fifteen days of the term can be charged a per diem rate for housing and meal plans for the period between notification of withdrawal and their departure from campus, in addition to what that student already paid to cover room and board.[8] A withdrawn student may be required to leave campus within 48 hours and charged a per diem rate for those 48 hours they remain on campus.

33.    Yale requires withdrawn students to remain away for one or two full terms (after the term in which they withdraw), even if they are ready to return earlier. Whether one or two full terms away is required depends on the specific type of withdrawal.[9] In contrast, a student on a leave of absence is not required to stay away for a prescribed period of time.

34.    Thus, Yale's withdrawal policy imposes unreasonable burdens on students who withdraw for disability-related reasons and discourage students from withdrawing from Yale due to a disability when that is appropriate; a student on withdrawal does not have the option to continue health insurance, is banned from campus, must relinquish their housing, may lose tuition, room, and board fees already paid, and must remain away for a prescribed minimum period of time, even if they can provide documentation from a medical provider recommending that they return earlier. Also, as described below, they must go through a daunting reinstatement process.

---

[8] *Yale College Undergraduate Regulations 2022-2023: Financial Services*, YALE UNIVERSITY, http://catalog.yale.edu/undergraduate-regulations/regulations/financial-services/ (last visited Nov. 29, 2022).
[9] *Yale College Programs of Study 2022-2023: Leave of Absence, Deferral, Withdrawal, and Reinstatement*, YALE UNIVERSITY, http://catalog.yale.edu/ycps/academic-regulations/leave-of-absence-withdrawal-reinstatement/ (last visited Nov. 29, 2022).

      **c.**  <u>**Yale Discriminates Against Students Who Seek to Return after a Withdrawal**</u>

35.    After a student withdraws, Yale imposes a daunting reinstatement process.

36.    Yale's reinstatement policy requires the student to submit an application form, a personal statement, and letters of support—echoing the requirements of Yale's initial application process. The student must persuade Yale that they were "constructively occupied" during their withdrawal. Some students are also subject to a requirement to complete coursework before they return. There are only two windows during the year when a student can apply for reinstatement.

37.    Moreover, Yale allows students to be reinstated after a personal withdrawal only once, regardless of whether the second personal withdrawal or reinstatement is reasonable in light of the student's disability.[10]

38.    Students who are reinstated after a withdrawal must meet higher academic standards than their peers.[11] Such students must not fail in any courses for the two terms following their return. If reinstated students do fail a course, they are ordinarily required to withdraw again. In contrast, students who have not withdrawn may fail a course in up to three successive terms before losing good academic standing. In other words, a student who has withdrawn has less room for failure than their peers, regardless of their academic record prior to withdrawal.[12]

39.    In the reinstatement process, Yale's policies do not provide for deference to the views of the student's treating professionals. As described below, when then-undergraduate

---

[10] *Id.*

[11] *See Yale College Programs of Study 2022-2023: Leave of Absence, Deferral, Withdrawal, and Reinstatement*, YALE UNIVERSITY, http://catalog.yale.edu/ycps/academic-regulations/leave-of-absence-withdrawal-reinstatement/ (last visited Nov. 29, 2022); *see also Yale College Programs of Study 2022-2023: Promotion and Good Standing*, YALE UNIVERSITY, http://catalog.yale.edu/ycps/academic-regulations/promotion-good-standing/ (last visited Nov. 29, 2022).

[12] *Yale College Programs of Study 2022-2023: Leave of Absence, Deferral, Withdrawal, and Reinstatement*, YALE UNIVERSITY, http://catalog.yale.edu/ycps/academic-regulations/leave-of-absence-withdrawal-reinstatement/ (last visited Nov. 29, 2022)

student Rishi Mirchandani sought reinstatement, which was supported by his treating providers, Yale did not allow him to return.

40.     Yale also administers its withdrawal and reinstatement policy in a way that compounds the hurdles for students with mental health disabilities. It provides little help navigating its confusing policies, which require review of multiple and sometimes conflicting webpages to understand the options and consequences for time off.[13] Yale has explained to students what the requirements will be for them to return only after months into a withdrawal period. Often, Yale does not explain its reasons for refusing reinstatement or provides reasons which are inconsistent with its own policies.

41.     These practices discriminate against students who withdraw from Yale for disability-related reasons, and they also discourage students from withdrawing from Yale due to a disability when that is appropriate.

### d.  Yale Is a "Full-Time School"

42.     Yale's policies and practices make it difficult to enroll in Yale less than full-time, even when required as a reasonable accommodation for a mental health disability. Yale requires students each semester to earn a certain number of credits to remain in good academic standing and also requires students to graduate within eight or at most nine semesters. These requirements, as well as the administrators' belief that Yale is and should be a "full-time school," means that part-time enrollment is not a practical option for most students, even when required as a reasonable accommodation for a mental health disability. Yale's practice of charging full tuition for students who are not taking a full course load also makes it difficult for students to pursue part-time study.

---

[13] See Serena Puang, "I had to choose between my education and my safety": How Yale's withdrawal and readmission policies leave students no choice but to stay, YALE DAILY NEWS (Jan. 31, 2022), http://features.yaledailynews.com/blog/2022/01/31/testing/.

43.     For years, Elis for Rachael and other student groups have tried to remove this barrier for students with mental health disabilities.

44.     It is Plaintiffs' understanding that Yale has virtually never granted extended part-time study as a reasonable accommodation for a mental health disability.

45.     Students understand that requesting part-time study, as a reasonable accommodation for their mental health disability, would be futile. When Plaintiff Alicia Abramson withdrew from Yale, she understood, after discussions with her Yale Mental Health psychiatrist and her Yale dean, that, as a practical matter, her only options were to attend Yale full-time or withdraw. Her review of Yale's written policies confirmed this understanding.

46.     Yale does, however, allow part-time study for reasons that are not disability related. Adult students re-entering academia after time away are permitted to take part-time loads.

47.     If students take less than a full-time course load, it is difficult for them to meet Yale's requirement that students graduate after eight, or at most nine, semesters of study.

48.     Students must remain away for at least one semester for medical withdrawal and for at least two semesters for personal withdrawal. The semester in which they withdraw is counted against the eight or nine semesters in which they must complete their degree.

**e.   Yale Refuses or Makes It Unreasonably Difficult to Secure Disability-Related Accommodations in Coursework or Housing**

49.     Yale's refusal to allow, as reasonable accommodations, either part-time study or to extend the time for earning a degree, are examples of its broader failure to provide reasonable accommodations for students with mental health disabilities. In most instances, Yale is on notice of a student's mental health disability, yet it fails to engage in an interactive process about potential accommodations or offer alternatives to withdrawal for students who need reasonable accommodations.

50.     The reasonable accommodations Yale will consider are limited and often not appropriate for the situation. Yale's Student Accessibility Services Office ("SAS") is charged with receiving and reviewing requests for some types of accommodations. However, it will allow only certain types of accommodations and modifications, such as notetaking, and imposes unreasonable hurdles to receive even those, while refusing accommodations related to attendance and scheduling. For example, Plaintiff Alicia Abramson was told by SAS that Yale would not allow virtual attendance as an accommodation, as described below.

51.     Students who need accommodations that are not on SAS' narrow menu can sometimes secure accommodations by petitioning individual faculty and deans. However, this avenue for securing accommodations is not publicized and students are often unaware it exists. Also, individual faculty and deans vary widely in their understanding of and experience with disability accommodations. In the same term that Yale deans allowed then-student Rishi Mirchandani to make up coursework after being hospitalized for mental health reasons, then-student Nicolette Mántica was required to take exams in the hospital for a mental health crisis, with no opportunity to make up assignments; she received a "W" in most of her courses that term.

52.     Indeed, a psychiatrist at Yale Health admitted to Plaintiff Alicia Abramson that it was Yale Mental Health's policy never to write notes to help students obtain reasonable accommodations.

## II.     YALE'S DISCRIMINATION HAS HARMED THE PLAINTIFFS AND OTHERS SIMILARLY SITUATED

### a.     Alicia Abramson

53.     Alicia Abramson started at Yale in the fall of 2018 and withdrew for mental health reasons in October 2019, the first term of her sophomore year.

54.     Abramson got A's in most of her classes during her freshman year at Yale.

55.     Abramson has had depression since childhood but did not receive treatment until she became a student at Yale. Her mental health worsened as she entered her sophomore year in the fall of 2019, in part due to an eating disorder.

56.     In the fall 2019, Abramson spoke to Yale Mental Health psychiatrist Dr. Francesco Peluso about possible accommodations to help with her depression-related attendance issues.

57.     Dr. Peluso prescribed Abramson an antidepressant and an antipsychotic but told Abramson that Yale Mental Health had a policy of not writing notes for students to obtain accommodations based on her disability. The reason, he said, was students could be untruthful about their symptoms.

58.     Abramson was aware that Yale did not allow students to take less than a full course load, even as an accommodation for a disability, and hence did not request permission to take less than a full course load. She would have preferred to have taken a part-time course load, which would have allowed her to both remain at Yale and attend to her mental health disability.

59.     Understanding there to be no other options, Abramson requested a withdrawal on October 7, 2019, about five weeks into the term. Abramson's request was approved after a brief conversation with the dean of her residential college. There was no exploration or discussion of accommodations, such as part-time study, that might allow her to remain at Yale.

60.     Abramson also spoke to the then-Interim Director of Mental Health Paul Hoffman and asked him a number of questions related to her withdrawal, including about insurance coverage and whether she might be able to receive intensive treatment at Yale. Hoffman was unable to answer most of her questions.

61.     Upon her withdrawal in October 2019, Abramson forfeited 75% of the tuition she had paid for the term and lost her insurance coverage after 30 days.

62.     Per Yale's withdrawal policy, Abramson was banned from making use of Yale libraries or athletic or other facilities, including participating in extracurricular activities or attending classes. Abramson was not allowed to set foot on campus without prior permission from Yale.

63.     Yale informed Abramson that, per its medical withdrawal policy, the earliest term to which she could apply to be reinstated was the fall 2020 term.

64.     In order to be reinstated, Yale required Abramson to provide an application form, a personal statement, and three letters of support, including one from a medical provider, to interview with the Chair of the Reinstatement Committee, and the Director of Mental Health & Counseling; and to complete two classroom courses (specifically "not online courses") at an accredited four-year university, earning a grade of B or higher.

65.     Yale informed Abramson that the Reinstatement Committee would assess whether she had used her time away from Yale "productively" and been successfully treated.

66.     During her withdrawal, Abramson lived with her father in California and completed an intensive outpatient program.

67.     Abramson completed two courses at a local university, at significant cost to her, as then required by Yale's reinstatement policy. Abramson was reinstated for the fall term of 2020 but took additional time off because of the COVID pandemic and returned to campus in the fall of 2021.

68.     Abramson has been successful in her courses since her return.

69.     However, she has continued to experience difficulties in securing reasonable accommodations.

70.     On the advice of her psychiatrist, she requested she be allowed to live off campus, although as a sophomore she was supposed to live in on-campus housing. The Student Accessibility Services Office ("SAS") instructed her to submit a letter from her psychiatrist explaining the need for an accommodation. SAS then said it could not grant an exception to the on-campus housing policy. After repeated efforts, Abramson finally persuaded SAS to approve her accommodation.

71.     Abramson tried but was unable to get SAS to approve her attending certain classes virtually as an accommodation, which she needed due to symptoms of insomnia and disruptions to her sleep patterns. Before going to SAS, she was directed to get a "dean's excuse," (sometimes referred to as a "dean's extension") but that turned out not to be the right avenue. Abramson submitted a letter to SAS from her psychiatrist in support of the requested accommodation, but it was denied, although the year prior it had been routine for students to attend class virtually. This accommodation was still being routinely granted to students who tested positive for COVID at the time of her request.

72.     When she asked SAS Associate Director Jaclyn Moriarty why the accommodation had been denied, Moriarty said that the psychiatrist's letter did not "draw a logical, clear connection between the functional limitations or impact of the disability and the requested accommodation." Abramson submitted a more detailed letter from her psychiatrist and an additional letter from a doctor specializing in sleep disorders, but her request was again denied. SAS also suggested an entirely inappropriate alternative.

73.     Abramson then went to each of her professors, who approved her request for remote attendance. Since returning to Yale, Abramson has received A's in the majority of her classes and currently has a cumulative grade point average of 3.83.

74.     While Abramson has been successful in her academic work since returning to Yale, she is concerned that, if her condition worsens (and it might), she will again be subject to Yale's discriminatory policies and practices.

**b. <u>Hannah Neves</u>**

75.     Hannah Neves started as an undergraduate at Yale in August 2018.

76.     Neves did well in her classes freshman year and joined an improv group, participated in student theater productions, and volunteered as a guide at one of the university's art museums.

77.     Neves began experiencing symptoms of depression after starting at Yale and sought therapy.

78.     Because she was unable to get an appointment with a therapist from Yale Mental Health quickly, Neves chose instead to see a private therapist off-campus.

79.     In the fall of her sophomore year, Neves' mental health worsened and began affecting her academic performance.

80.     In February of her junior year, approximately four weeks into the spring term, Neves took an overdose of aspirin.

81.     Neves called a friend and was transported to the emergency room at Yale New Haven Hospital. She was later transferred to Yale New Haven Hospital. There she was visited by the dean of her residential college, Surjit K. Chandhoke, Yale psychiatrist Dr. Heather Paxton, and Director of Mental Health & Counseling Paul Hoffman.

82.     Chandhoke, Paxton, and Hoffman all encouraged Neves to request a withdrawal from Yale and apply for reinstatement for the spring of 2021. Each said it would "look bad" for her if she was withdrawn involuntarily.

83.     There was no exploration of accommodations that might allow her to remain at Yale, including taking less than a full course load.

84.     Neves said that she did not want to withdraw because she was concerned about taking so much time off and wanted to remain enrolled so she would be able to graduate with her friends in 2022.

85.     Neves stated that if she was required to take time off, she wanted to return the following term, in the fall of 2020.

86.     The doctors treating Neves at the hospital told her that they did not see any reason why she could not return to Yale for the fall term of 2020.

87.     Neves asked Paxton and Hoffman if she could apply to return in the fall of 2020, rather than the spring of 2021, if she withdrew voluntarily. She was told that she could not due to "policy."

88.     Neves did not have access to her cell phone during her approximately two-week stay at Yale New Haven Hospital. When discharged, Neves saw an email she had received from Yale four or five days earlier stating that she had been involuntarily withdrawn from Yale and had 72 hours to leave the campus.[14]

89.     Neves spoke to Chandhoke, who told her that she could return to her dorm room only if accompanied by a Yale police officer. Neves chose instead to have her mother go to her room to retrieve her belongings. Neves wanted to say goodbye to her friends but was told by Chandhoke she could only do so off campus.

90.     Because Neves had a student visa, she had to leave the United States and return to Brazil within fifteen days of her withdrawal. Doing so was very costly on short notice.

---

[14] It appears that, despite Yale's written policy giving students to 48 hours to move out, some students are given more time.

91.     Upon her withdrawal, Neves forfeited some of the tuition she had paid for the term and lost her insurance coverage.

92.     Per Yale's withdrawal policy, Neves was banned from making use of Yale libraries or athletic or other facilities, including participating in organized extracurricular activities or attending classes. Neves was not allowed to set foot on campus without receiving prior permission.

93.     Yale informed Neves that, per policy, the earliest term to which she could apply to be reinstated was spring 2021.

94.     In order to be reinstated, Yale required Neves to provide an application form, three letters of support, including one from a medical provider, to interview with the Chair of the Reinstatement Committee and the Director of Mental Health & Counseling, and to complete two classroom courses at an accredited four-year university, earning a grade of B or higher. Yale informed Neves that, per the withdrawal policy, the Reinstatement Committee expected withdrawn students to be "constructively occupied" and to maintain a "satisfactory standard of conduct" during the withdrawal.

95.     Yale also informed Neves that the Yale Reinstatement Committee would reinstate only those students who had the ability to "complete degree requirements within the specific number of terms of enrollment remaining to them." This, Yale explained, meant that reinstated students were expected to complete and pass all courses for each of the two terms following their reinstatement. Students who failed to meet that condition would "ordinarily [be] required to withdraw" again.

96.     Neves' treatment providers in Brazil told her, during the summer of 2020, that they thought it would be entirely appropriate for Neves to return to Yale in the fall of 2020, based on

her progress. Neves successfully completed four courses during her withdrawal, and also worked for a nonprofit organization.

97.     Neves contacted then-Chair of the Reinstatement Committee Dean Risa Sodi and her staff several times during the summer asking for more information about the reinstatement process and application but was not given any such information until October 2020.

98.     Yale prevented Neves from returning for the fall term of 2020. She was permitted to return to Yale for the spring term of 2021 and has been successful at Yale since her return. She is on track to graduate with a degree in Art and Art History in spring 2023.

99.     Neves has volunteered as a Reinstatement Peer Contact helping other Yale students to navigate the reinstatement process, including providing information and guidance they were unable to get from Yale.

100.    Neves experienced trauma from being involuntarily withdrawn from Yale while hospitalized and forced to leave the U.S., which, among other things, has left her wary of seeking mental health support from Yale and concerned that she will be subject again to Yale's discriminatory policies and practices.

### c.   Elis for Rachael

101.    Elis for Rachael provides emotional support, mentorship, and financial support to current students with mental health concerns and advocates for policy change at Yale, among other things.

102.    Elis for Rachael:

> a.   Collects testimonials about mental health and illness at Yale to give current students "something that you relate to, maybe even a source of hope."[15]

---

[15] *Our Stories*, ELIS FOR RACHAEL, https://www.elisforrachael.org/personal-experience (last visited Nov. 29, 2022).

b.   Raises funds to provide financial support to students who experience financial hardship related to taking time off for mental health reasons, including funds that the organization would not have to expend absent Yale's discriminatory policies. To date, the organization has raised and distributed approximately $13,000 for rent, groceries, Yale Summer Sessions tuition, and tuition for coursework at other universities while on leave or withdrawal.

c.   Counsels and mentors students who have mental health disabilities and are experiencing challenges at Yale related to them. Some, but not all, of this activity is focused on helping students navigate the discriminatory policies and practices challenged in this lawsuit. Elis for Rachael counseled Plaintiffs Alicia Abramson and Hannah Neves.

d.   Meets with current students and student-led organizations to discuss mental health concerns and reform of Yale's mental health policies, including but not limited to the policies challenged in this lawsuit.

e.   Conducts research about other universities' policies and crafts proposals for Yale for policies that do not discriminate and that better support students, including students with mental health disabilities.

f.   Meets with Yale to urge them to eliminate mental health disability discrimination, implement best practices for supporting students with mental health disabilities, and reduce the likelihood of future deaths by suicide and fears around Yale's discriminatory policies.

       g.  In order to provide the most effective advocacy for Yale students with mental health disabilities, Elis for Rachael regularly consults with current students and student groups for information and guidance

103.    Thus, Elis for Rachael provides advocacy and support for Yale students experiencing or at risk of experiencing mental health issues so that they can safely stay at Yale and benefit from its programs and activities.

104.    Because of the illegal and discriminatory policies being challenged, Elis for Rachael must devote more financial and other resources toward assisting students, including towards individual assistance, education, advocacy, and training directly related to those policies.

105.    Resources currently devoted to addressing and dealing with the impact of Yale's unlawful discriminatory policies and practices could instead be spent on providing other needed advocacy and support to students.

### d.  <u>Rishi Mirchandani</u>

106.    Rishi Mirchandani is one of the leaders of Elis for Rachael.

107.    Mirchandani graduated from Yale *summa cum laude* with a B.A. in Mathematics and is a multi-genre pianist based in New York.

108.    In 2017, toward the end of the fall term of his junior year at Yale, Mirchandani experienced a mental health crisis that required him to be hospitalized. Mirchandani received "incompletes" for his fall term classes, but was authorized by the Dean of Morse College, Angela Gleason, to make up his outstanding coursework, which consisted of final exams.

109.    Yale required Mirchandani to complete an intensive outpatient program during winter break in order to return for the spring 2018 term, which he did. During winter break, he experienced a concussion.

110.    Mirchandani told Yale's Resource Office on Disability (now SAS) about his concussion but did not disclose his mental health issues because he feared negative repercussions.

111.    When he returned to campus for the spring term, Yale Mental Health matched him with a psychiatrist, who prescribed him a medication that caused side effects that made it very difficult for him to function.

112.    Mirchandani considered voluntarily withdrawing before spring break, but did not do so, in part because he was worried about the implications of an extended absence and the uncertainty of reinstatement.

113.    Mirchandani received authorization from his doctor to stop the medication. Once he stopped, he began experiencing rapid cycling between mania and then depression and suicidal thoughts.

114.    Mirchandani knew students who had been involuntarily withdrawn due to mental health issues. The issues he was experiencing led him to initiate a medical withdrawal on April 6, 2018.

115.    Upon his withdrawal, Mirchandani forfeited 100% of the tuition he had paid for the term.

116.    Per Yale's withdrawal policy, Mirchandani was banned from making use of Yale libraries or athletic or other facilities, including participating in organized extracurricular activities and attending classes. Mirchandani was not allowed to set foot on campus without receiving prior permission from his dean.

117.    In order to be reinstated, Yale required Mirchandani to provide an application form, a personal statement, and three letters of support, including one from a medical provider; to interview with the Chair of the Reinstatement Committee and the Director of Mental Health &

Counseling; and to complete two classroom courses (specifically "not online courses") at an accredited four-year university, earning a grade of B or higher.

118.   Yale informed Mirchandani that the Reinstatement Committee would assess whether he had used his time away from Yale "constructively" and received successful treatment.

119.   For the majority of his medical withdrawal, Mirchandani lived with his parents in Pittsburgh, Pennsylvania, and received A's in three courses that he took through Yale's summer program.

120.   Mirchandani's treating professionals recommended he return to Yale for the fall term of 2018, as they thought he was ready to return, and that this would be better for his mental health. However, Yale's withdrawal policy required him to stay away until the spring term of 2019.

121.   Mirchandani emailed Dean Sodi on June 25, 2018, asking how he might qualify for an exception to the policy and apply for early reinstatement. On July 9, 2018, Mirchandani sent Sodi a detailed email explaining why he felt that early reinstatement was appropriate, citing his strong academic performance, his improved mental health, and the support of his doctors and professors. Mirchandani also submitted a completed reinstatement application by mail, including a personal statement, academic transcripts, and letters from two doctors and one professor.

122.   On July 18, 2018, Sodi informed Mirchandani that the Committee had declined his request for early reinstatement. Later, Sodi informed him that the Committee "didn't discern the extraordinary circumstances that would merit an early return to Yale."

123.   Because Mirchandani had forfeited his tuition payment for the spring term of 2018 when he withdrew, and because he had paid to take courses while withdrawn, he was concerned that he would not be able to afford the additional two terms he would need to graduate from Yale.

124.   On August 24, 2018, Mirchandani submitted a request for acceleration, which would allow him to graduate in only seven terms, to the Committee on Honors and Academic Standing. The request included a proposed curriculum for meeting his overall credit requirements and the requirements of his major.

125.   As a part of his application for reinstatement for the spring 2019 term, Mirchandani was required to participate in two interviews. In the first, Yale Health administrator Dr. Lorraine Siggins, Director of Mental Health & Counseling, stated that the reinstatement process was made intentionally difficult to test readiness to return to academic life. In his second interview, Sodi, a former Italian professor with no medical qualifications, asked questions about his psychiatric medications and treatment.

126.   Mirchandani's reinstatement and acceleration requests were approved and he re-enrolled at Yale for the spring term of 2019. Mirchandani completed six courses during his final term at Yale, in spring 2019, more courses than the average Yale undergraduate, and earned A's in all of them.

### e.   Nicolette Mántica

127.   Nicolette Mántica enrolled at Yale in the fall of 2015.

128.   A member of Silliman College, Mántica participated in choir, The Yale Hunger and Homelessness Action Project, and served as a tour manager on campus.

129.   Mántica maintained a 3.8 GPA into her third year at Yale.

130.   In late August 2017, Mántica began seeing a therapist through Yale Mental Health & Counseling and was prescribed medication.

131.   Mántica engaged in non-suicidal self-harm.

132.     On December 10, 2017, Mántica's Residential College Dean Leanna Barlow met with her and stated that two of Mántica's friends had reported her self-harm and that Barlow was obligated to take Mántica to Yale Health.

133.     Mántica accompanied Barlow to Yale Health, where the on-call staff recommended Mántica go to Yale New Haven Hospital. Yale Health staff told Mántica that she would be in the hospital for "24 to 48 hours." Mántica agreed and was transferred to the hospital via ambulance. While at the hospital, Mántica was told that she would be transferred to Yale Psychiatric Hospital and would need to remain there for approximately one week.

134.     While Mántica was in Yale New Haven Hospital, she was visited by Barlow. Then, Dr. Eric Millman, an administrator from Yale Health, visited Mántica and informed her that she would likely be withdrawn from Yale University.

135.     This was the first time Mántica learned that she could be involuntarily withdrawn from school. Dr. Millman told her that, "if anything were to happen to [her], [she] would be a liability to the university."

136.     Mántica expressed confusion about what the plan would be if she was withdrawn, and concern about her ability to get the "intensive therapy" that had been recommended for her in the rural location of her parents' home.

137.     Barlow informed Mántica that, since she had not completed her classes, she would have to receive a "W" in each.

138.     While in the hospital, Mántica agreed to withdraw from Yale, even though she wanted to remain enrolled. Her understanding was that, if she did not withdraw, she would be involuntarily withdrawn.

139.    Once discharged from the hospital, Mántica was told she had to immediately remove her belongings from her Yale dormitory.

140.    A police officer escorted Mántica and her parents to her dorm, where they were given two hours to collect Mántica's belongings while the officer waited in the hallway.

141.    Per Yale's withdrawal policy, Mántica was banned from making use of Yale libraries or athletic or other facilities, including participating in organized extracurricular activities or attending classes. Mántica was not allowed to set foot on campus without receiving prior permission.

142.    Mántica returned home with her parents to Georgia.

143.    Yale informed Mántica that, per the medical withdrawal policy, she would not be eligible for reinstatement until fall 2018.

144.    Yale informed Mántica that the reinstatement committee would "consider how [she] used [her] time away from Yale" and whether she received "appropriate medical treatment."

145.    Due to the rural location of her hometown, it was difficult for Mántica to complete the reinstatement requirements Yale imposed. The closest accredited university to Mántica's home was two hours away and she was unable to afford the tuition.

146.    Due to her poor experience with Yale and the hurdles imposed by the reinstatement process, Mántica decided to not return to Yale.

147.    Mántica entered Northwestern University in the fall of 2018. Northwestern offered Mántica disability-related accommodations, and she successfully graduated in the spring of 2020. Mántica now works at an elementary school.

148.    Mántica continues to struggle with her experiences at Yale, including being pressured to withdraw, and with the stigma attached to the perception that she was "kicked out" of Yale.

**f.  <u>Brian Spence</u>**

149.    Brian Spence started as a graduate student in Yale's Nurse Practitioner program in the fall of 2016.

150.    Spence had been receiving treatment for bipolar disorder prior to enrolling at Yale and continued treatment through Yale Health while he was a student. Spence's mental health worsened during the fall term of 2018.

151.    Spence was reluctant to disclose some of his mental health symptoms to his Yale provider because of stories he had heard about students being involuntarily withdrawn.

152.    On October 18, 2018, Spence sought help at Yale New Haven Hospital when he experienced suicidal thoughts and was placed in the Crisis Intervention Unit (CIU).

153.    A mental health professional affiliated with Yale Health came to the hospital and evaluated him. Spence's doctor later told him that Yale New Haven Hospital has practice of informing the university whenever an enrolled student is admitted, with or without that student's consent.

154.    Spence was discharged with a discharge plan that called for Yale Health to give him a counselor and for him to see a psychiatrist more frequently. Yale Health did not implement the plan.

155.    The following month, in November 2018, Spence overdosed and was admitted to Yale New Haven Hospital. Again, administrators from Yale Health, Dr. Millman and Dr. Siggins, came to the hospital. After Millman and Siggins consulted with Spence's social worker at Yale

New Haven Hospital, Spence was told that he would have to go home to Cleveland for patient treatment, rather than seek treatment in Connecticut.

156.    When Spence expressed concerns about this plan, he was told that "it [wouldn't] look good" for Spence to challenge the discharge plan.

157.    Spence graduated successfully in June 2019 and is now working as an Associate Director of Psychiatry at a non-profit health services organization in Cleveland.

### CLASS ACTION ALLEGATIONS

158.    Pursuant to Federal Rules of Civil Procedure 23(a)(1)-(4) and (b)(2), named Plaintiffs Elis for Rachael, Alicia Abramson, and Hannah Neves bring this action for injunctive and declaratory relief on their own behalf, and on behalf of all persons similarly situated.

159.    The class that Plaintiffs seek to represent is composed of all Yale students who have, or have a record of, mental health disabilities and who are being harmed, or reasonably fear being harmed, by the illegal policies and practices challenged in this lawsuit.

160.    The class claims asserted herein are solely for injunctive and declaratory relief for class members; damage claims are not included in the class allegations.

161.    The persons in the class are so numerous that joinder of all such persons is impracticable and the disposition of their claims in a class action is a benefit to the parties and the Court. According to reports, 11% of U.S. undergraduates report a disability, with mental health disabilities among the most commonly reported.[16] Yale disability advocates believe this is an undercount of the population at Yale, particularly with respect to students with mental health

---

[16] Michael Ndubisi, *Number of students reporting disabilities soars, yet likely remains an underestimate*, YALE DAILY NEWS (Mar. 30, 2022), https://yaledailynews.com/blog/2022/03/30/number-of-students-reporting-disabilities-soars-yet-likely-remains-an-underestimate/; *DiversAbility at Yale: Disability Facts*, YALE UNIVERSITY, https://day.yale.edu/disability-facts (last visited Nov. 29, 2022).

disabilities.[17] Even using the 11% number, however, would mean that more than 1,300 current Yale students have disabilities, and a significant number of those students have mental health disabilities.

162.   There is a well-defined community of interest in the questions of law and fact involved affecting the persons to be represented in that they are all being subjected to discrimination by Defendants' illegal policies and procedures.

163.   Common questions of law and fact predominate, including, but not limited to whether Yale violates disability discrimination laws through the policies and practices described above.

164.   Plaintiffs are adequate class representatives. Plaintiff Elis for Rachael provides services to and consults closely and regularly with class members and includes leaders who were subject to the challenged policies. Plaintiffs Alicia Abramson and Hannah Neves have been and reasonably fear being subject in the future to the challenged discriminatory policies. Plaintiffs' interests are not antagonistic to, or in conflict with, the interests of the class as a whole.

165.   The attorneys representing the class are highly trained, duly qualified, and experienced in representing plaintiffs in civil rights class actions including disability discrimination litigation.

166.   Plaintiffs' claims are typical of the claims of the class as a whole because Plaintiffs are individuals who are similarly affected by the violations, and an organization that serves individuals similarly affected by these violations.

167.   The class is ascertainable based on, *inter alia*, Yale's records.

---

[17] Michael Ndubisi, *Number of students reporting disabilities soars, yet likely remains an underestimate*, YALE DAILY NEWS (Mar. 30, 2022), https://yaledailynews.com/blog/2022/03/30/number-of-students-reporting-disabilities-soars-yet-likely-remains-an-underestimate/.

168.     Defendants have acted and/or failed to act on grounds generally applicable to the class as a whole, making final declaratory and injunctive relief appropriate with respect to the class as a whole. Plaintiffs and the Plaintiff class are in danger of suffering irreparable harm and have no adequate remedy at law.

### FIRST CAUSE OF ACTION

**Violation of the Americans with Disabilities Act**

169.     Plaintiffs and the class re-allege and incorporate herein all previously alleged paragraphs of this Complaint.

170.     Title III of the Americans with Disabilities Act ("ADA") and its implementing regulations entitle individuals with disabilities to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. 42 U.S.C. § 12182(a); 28 C.F.R. § 36.201(a).

171.     At all times relevant to this action, named Plaintiffs and members of the proposed class were and are Yale students who have a disability, were regarded as having a disability, or have a record of a disability, and thus were and are qualified individuals with disabilities within the meaning of the ADA. 42 U.S.C. § 12102.

172.     At all times relevant to this action, Yale has been and is a "place of public accommodation" within the meaning of Title III of the ADA, as an undergraduate or postgraduate school, or other place of education. 42 U.S.C. § 12181(7)(J).

173.     Title III prohibits public accommodations from denying or affording an unequal opportunity to an individual or class of individuals with disabilities, on the basis of a disability, the opportunity to participate in or benefit from the goods, services, facilities, privileges,

advantages, or accommodations of the entity or otherwise discriminating against them on the basis of disability. 42 U.S.C. § 12182(b)(1)(A)(i)–(ii); 28 C.F.R. § 36.202(a)–(b).

174.    Title III provides that goods, services, facilities, privileges, advantages, and accommodations shall be afforded to an individual with a disability in the most integrated setting appropriate to the needs of the individual. 42 U.S.C. § 12182(b)(1)(B); 28 C.F.R. § 36.203(a).

175.    Title III provides that an individual or entity shall not utilize standards or criteria or methods of administration that screen out, tend to screen out, or have the effect of discriminating on the basis of disability such that persons with disabilities cannot fully and equally enjoy any goods, services, facilities, privileges, advantages, or accommodations. 42 U.S.C. §§ 12182(b)(1)(D)(i), 12182(b)(2)(A)(i); 28 C.F.R. §§ 36.204, 36.301(a).

176.    Title III further defines discrimination to include the failure of a public accommodation to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities. 42 U.S.C. § 12182(b)(2)(A)(ii); 28 C.F.R. § 36.302(a).

177.    Regulations implementing Title III prohibit public accommodations from imposing a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures, such as reasonable modifications in policies, practices, or procedures, that are required to provide that individual or group with the nondiscriminatory treatment required under the ADA and its implementing regulations. 28 C.F.R. § 36.301(c).

178.    Yale has violated Title III of the ADA by denying named Plaintiffs and members of the proposed class, on the basis of disability, the opportunity to fully and equally enjoy,

participate in, and benefit from Yale's goods, services, facilities, privileges, advantages, and accommodations.

179.     Yale has violated Title III of the ADA by maintaining and executing policies and practices that utilize criteria and methods of administration that have the effect of discriminating against students with mental health disabilities by tending to screen them out of—and make it more onerous for them to regain access to—campus services, facilities, privileges, advantages, and accommodations, on the basis of disability.

180.     Yale has violated Title III of the ADA by failing to make reasonable modifications to its policies and practices to ensure that named Plaintiffs and members of the proposed class have equal access to the benefits of Yale's goods, services, facilities, privileges, advantages, and accommodations.

181.     Yale has violated Title III of the ADA by failing to provide named Plaintiffs and members of the proposed class goods, services, facilities, privileges, advantages, and accommodations in the most integrated setting appropriate to their needs.

182.     Yale's conduct constitutes ongoing and continuous violations of the ADA, and unless restrained from doing so, Yale will continue to violate the ADA. This conduct, unless enjoined, will continue to inflict injuries for which named Plaintiffs and members of the proposed class have no adequate remedy at law. Consequently, named Plaintiffs and members of the proposed class are entitled to injunctive relief pursuant to section 308 of the ADA (42 U.S.C. § 12188(a)), as well as reasonable attorneys' fees and costs, 42 U.S.C. § 12205.

183.     WHEREFORE, named Plaintiffs and members of the proposed class request relief as set forth below.

<u>**SECOND CAUSE OF ACTION**</u>

**Violation of Section 504 of the Rehabilitation Act of 1973**

184.     Plaintiffs and the class re-allege and incorporate herein all previously alleged paragraphs of the Complaint.

185.     Section 504 of the Rehabilitation Act of 1973 ("Section 504") provides that otherwise qualified individuals with disabilities shall not, solely by reason of their disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 29 U.S.C. § 794(a); 34 C.F.R. § 104.4(a).

186.     As individuals with mental health disabilities or who have a record thereof or who have been regarded as having a disability, named Plaintiffs and members of the proposed class are persons with disabilities within the meaning of Section 504. 29 U.S.C. § 794(a); 29 U.S.C. § 705(20). As admitted and current students, named Plaintiffs and members of the proposed class are otherwise qualified to participate in Yale's services, programs, and activities. 34 C.F.R. § 104.3(l)(3).

187.     As a university, Yale's operations are qualified programs or activities within the meaning of Section 504. 29 U.S.C. § 794(b)(2)(A); 34 C.F.R. §§ 104.3(k)(2)(i), 104.41. As an educational institution which permits students to pay education-related costs with the assistance of Federal grants and loans and has done so at all times relevant to the claims asserted in this Complaint, Yale is a recipient of Federal financial assistance sufficient to invoke Section 504 coverage. 34 C.F.R. § 104.3(h).

188.     Section 504 implementing regulations promulgated by the U.S. Department of Education ("DOE regulations") provide that recipients of Federal financial assistance, in providing

any aid, benefit, or service, may not, on the basis of disability, discriminate against an otherwise qualified person with a disability by providing them with an opportunity to participate in or benefit from the aid, benefit, or service that is different, separate, not equal, or not as effective as that which is afforded others. 34 C.F.R. § 104.4(b)(1)(i)–(iv).

189.    DOE regulations further prohibit recipients of Federal financial assistance from limiting a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving any aid, benefit, or service. 34 C.F.R. § 104.4(b)(1)(vii).

190.    DOE regulations prohibit recipients of Federal financial assistance from utilizing criteria or methods of administration, including within its admission policies, that have an adverse effect on persons with disabilities, or that have the purpose or effect of defeating or substantially impairing accomplishment of the recipient's program or activity objectives with respect to qualified persons with disabilities. 34 C.F.R. §§ 104.4(b)(4), 104.42(b)(2).

191.    DOE regulations provide that no qualified student with a disability shall, on the basis of disability, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any academic, research, housing, health insurance, counseling,

financial aid, athletics, recreation, other extracurricular, or other postsecondary education aid, benefits, or services. 34 C.F.R. § 104.43(a)*; see also* 34 C.F.R. §§ 104.43(c), 104.52(a)(1).

192.    DOE regulations require covered entities to operate their program or activity in the most integrated setting appropriate. 34 C.F.R. § 104.43(d).

193.    Yale has violated Section 504 by denying named Plaintiffs and members of the proposed class the benefits of their programs, services, and activities on the basis of disability.

194.    Yale has violated Section 504 by maintaining rules, including eligibility criteria and methods of administration, that have the effect of discriminating against students with mental health disabilities by tending to screen them out of maintaining student status and access to campus resources, including housing, on the basis of disability.

195.    As a proximate result of Yale's violations of Section 504 of the Rehabilitation Act, Plaintiffs and members of the proposed class have been injured as set forth herein.

196.    Because Yale's discriminatory conduct presents a real and immediate threat of current and continuing violations, declaratory and injunctive relief are appropriate remedies pursuant to 29 U.S.C. § 794a.

197.    Named Plaintiffs and members of the proposed class have no adequate remedy at law and unless the relief requested herein is granted, named Plaintiffs and members of the proposed class will suffer irreparable harm in that they will continue to be discriminated against and denied access to Yale's programs and services. Consequently, named Plaintiffs and members of the

proposed class are entitled to injunctive relief, as well as reasonable attorneys' fees and costs. 29 U.S.C. §§ 794a(a)(2), 794a(b).

198.    WHEREFORE, named Plaintiffs and members of the proposed class request relief as set forth below.

### THIRD CAUSE OF ACTION

**Violation of Section 1557 of the Patient Protection and Affordable Care Act**

199.    Plaintiffs and the class re-allege and incorporate herein all previously alleged paragraphs of the Complaint.

200.    Section 1557 of the Patient Protection and Affordable Care Act ("Section 1557"), 42 U.S.C. § 18116, provides, "an individual shall not, on the ground prohibited under . . . section 794 of title 29 [Section 504], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance . . . ." 42 U.S.C. § 18116.

201.    Yale is a recipient of Federal financial assistance sufficient to invoke Section 1557 coverage.

202.    Yale operates health programs and activities within the meaning of Section 1557, including through the provision of health insurance to its students.

203.    Yale has violated Section 1557 by denying named Plaintiffs and members of the proposed class the benefits of their health programs and activities, including health insurance, on the basis of disability.

204.    As a proximate result of Yale's violations of Section 1557, named Plaintiffs and members of the proposed class have been injured as set forth herein.

205.    Because Yale's discriminatory conduct presents a real and immediate threat of current and continuing violations, declaratory and injunctive relief are appropriate remedies pursuant to 29 U.S.C. § 794a.

206.    Named Plaintiffs and members of the proposed class have no adequate remedy at law and unless the relief requested herein is granted, named Plaintiffs and members of the proposed class will suffer irreparable harm in that they will continue to be discriminated against and denied access to Yale's health programs and activities. Consequently, named Plaintiffs and members of the proposed class are entitled to injunctive relief, as well as reasonable attorneys' fees and costs. 29 U.S.C. §§ 794a(a)(2), 794a(b).

207.    WHEREFORE, named Plaintiffs and members of the proposed class request relief as set forth below.

## FOURTH CAUSE OF ACTION

### Violation of the Fair Housing Act

208.    Plaintiffs and the class re-allege and incorporate herein all previously alleged paragraphs of the Complaint.

209.    The Fair Housing Act prohibits discrimination in the terms, conditions, sale, or rental of a dwelling, on the basis of disability. 42 U.S.C. § 3604(f)(1)–(2); *see also* 24 C.F.R. §§ 100.20, 100.60(a), 100.60(b)(2).

210.    As persons with mental health disabilities, named Plaintiffs and members of the proposed class are protected from discrimination under the Fair Housing Act. 42 U.S.C. § 3602(h); s*ee also* 24 C.F.R. § 100.201.

211.    Yale's residence halls are covered "dwellings" under the Fair Housing Act. *See* 42 U.S.C. § 3602(b)–(c); *see also* 24 C.F.R. § 100.201.

212.    The Fair Housing Act prohibits discrimination in the form of refusing to make reasonable accommodations in rules, policies, practices, or services, when such may be necessary to afford a person with a disability an equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3)(B).

213.    Under the Fair Housing Act, it is unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of any right granted or protected by section 3604 of the Fair Housing Act. 42 U.S.C. § 3617.

214.    The Fair Housing Act also prohibits making, publishing or printing any notice or statement with respect to the sale or rental of a housing accommodation that indicates a preference, limitation or discrimination on the basis of disability. 42 U.S.C. § 3604(c).

215.    U.S. Department of Housing and Urban Development ("HUD") regulations implementing the Fair Housing Act clarify that prohibited actions include using different criteria, standards, requirements, rental procedures, or lease or contract provisions, because of disability. 24 C.F.R. §§ 100.60(b)(4), 100.65(b)(1).

216.    Prohibited actions further include limiting the use of a dwelling's privileges, services, or facilities, or evicting tenants because of disability. 24 C.F.R. §§ 100.60(b)(5), 100.65(b)(4).

217.    Yale has violated the Fair Housing Act by maintaining and implementing terms and conditions of housing that exclude and otherwise discriminate against named Plaintiffs and members of the proposed class on the basis of disability.

218.    Yale has further violated the Fair Housing Act by refusing to make reasonable accommodations in rules, policies, and services, when such accommodations may be necessary to

afford named Plaintiffs and members of the proposed class equal opportunities to use and enjoy their residence halls.

219.    Yale has also violated the Fair Housing Act by publishing statements, including campus-wide housing policies, that discriminate or indicate a preference or limitation on the basis of disability.

220.    Yale has violated HUD regulations implementing the Fair Housing Act by utilizing criteria, standards, and requirements that discriminate against named Plaintiffs and members of the proposed class on the basis of disability, including requiring them to submit personal statements and medical documentation in advance of being readmitted to residence halls.

221.    Named Plaintiffs and members of the proposed class have no adequate remedy at law and unless the relief requested herein is granted, named Plaintiffs and members of the proposed class will suffer irreparable harm in that they will continue to be discriminated against and denied access to Yale's programs and services. Consequently, named Plaintiffs and members of the proposed class are entitled to injunctive relief, as well as reasonable attorneys' fees and costs. 42 U.S.C. § 3613(c).

## **PRAYER FOR RELIEF**

WHEREFORE, named Plaintiffs and members of the proposed class request:

a.  That this matter be certified as a class action as set forth above, that Plaintiffs be appointed class representatives, and their attorneys be appointed class counsel;

b.  That Defendants be enjoined from violating the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, Section 1557 of the Patient Protection and Affordable Care Act, and the Fair Housing Act;

c.  That Defendants be ordered to adopt policies and procedures sufficient to remedy the

violations complained of herein;

d.  An Order finding and declaring that Defendants' acts, omissions, policies, and practices

as challenged herein are unlawful;

e.  An award of reasonable attorneys' fees and costs; and

f.  Such other relief that the Court deems just and proper.

Dated: November 30, 2022

DISABILITY RIGHTS OF CONNECTICUT, INC.

By:   *Kasey Considine*

Kasey Considine (ct30756)
Deborah Dorfman (Application for
Admission *Pro Hac Vice* to be filed)
CT Juris No. 442946
846 Wethersfield Ave.
Hartford, CT 06114
Tel: (860) 297-4300
Email: kasey.considine@disrightsct.org
       deborah.dorfman@disrightsct.org

BAZELON CENTER FOR MENTAL HEALTH
LAW

Ira Burnim (Application for Admission *Pro
Hac Vice* to be filed)
Monica Porter (Application for Admission
*Pro Hac Vice* to be filed)
1090 Vermont Avenue NW, Suite 220
Washington, DC 20005
Tel: (202) 467-5730
Email: irab@bazelon.org
       monicap@bazelon.org

VLADECK, RASKIN & CLARK, P.C.

Maia Goodell (Application for Admission pending)
Susanna Barron (Application for Admission *Pro Hac Vice* to be filed)
565 Fifth Avenue, 9th Floor
New York, New York 10017
Tel: (212) 403-7300
Email: mgoodell@vladeck.com
        sbarron@vladeck.com

*Counsel for Plaintiffs*